# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,

v.                                  Case No. 03-CR-81060-DT

THAIR JABERO and JIHAN JABERO,

       Defendants.

_____/

## OPINION AND ORDER DENYING DEFENDANTS' "MOTION FOR AN EVIDENTIARY HEARING AND TO SUPPRESS EVIDENCE SEIZED UNDER SEARCH WARRANTS"

Before the court is Defendants' "Motion for an Evidentiary Hearing and to Suppress Evidence Seized Under Search Warrants." This motion has been fully briefed and, for the reasons set forth below, the court will deny Defendants' motion.

## I. BACKGROUND

Defendants Thair Jabero and Jihan Jabero (husband and wife) are charged with multiple felonies including, *inter alia*, conspiracy to distribute and the distribution of ephedrine while "knowing, or having reasonable cause to believe" that it would be used to manufacture methamphetamine in violation of 21 U.S.C. §§ 841(c)(2) and 846, and conspiracy to launder monetary instruments in violation of 16 U.S.C. § 1956(a) (*See* 11/25/03 Indictment.) The charges against Defendants arise, in part, out of a series of undercover visits to Defendants' place of business by a government agent, and purchases by the agent of certain medicines containing ephedrine and certain evidence obtained by the government pursuant to two search warrants issued for Defendants'

place of business "Andy's Party Store," and their home.  (*See* Defs.' Mot. at ¶ 2; Gov.'s Resp. at 5.)

On October 15, 2003, Drug Enforcement Administration Task Force Agent Pat DeBottis sought and obtained from United States Magistrate Judge Steven Whalen the two search warrants at issue in this case.  (Defs.' Mot. Br. Exs. 1 & 2.)  Two separate search warrants issued; one for "Andy's Party Store" at 8473 East M-71 in Durand Michigan, and one for Defendants' residence at 6367 Dalton Drive in Flushing, Michigan.  Agent Debottis's affidavit was offered in support of both warrants.

After describing the specific addresses associated with evidence of the crime of conspiracy to distribute a controlled substance and money laundering, the attachments to the warrants identified the particularized items to be search for and seized as:

1.  Quantities of controlled substances to include Ephedrine and Pseudoephedrine and, narctoics paraphernalia, including but not limited to packaging materials/equipment, scales, and other instrumentalities of narcotics activities;

2.  Receipts, notes, ledgers, tally sheets and other papers relating to the transportation, ordering, purchase, sale, and/or distribution of controlled substances;

3.  Tickets, notes receipts, and other items relating to domestic and international travel including airline tickets, care rental, and passports;

4.  Records, invoices, and receipts for real estate transactions, bank statements and related records, passbooks, money drafts, bank drafts, money orders, cashier's checks, wire transfers, and official checks;

5.  Drivers' licenses, birth certificates, social security cards, identification cards, and other items of identification in the names of co-conspirators, other fictitious identities or nominees, or their associates;

6.  Address books, phone directories, photographs, video tapes, undeveloped film and the contents therein, in particular, photographs of co-conspirators, of assets, and/or controlled substances;

2

7.  Receipts for packages or letters sent/received via United Parcel Service (UPS), Federal Express, United States Postal Service or similar companies;

8.  United States currency, jewelry, precious metals, and financial instruments, including but not limited to stocks and bonds;

9.  Safety deposit box records including safety deposit box keys;

10.  Any and all information and/or data stored in the form of magnetic or electronic coding on computer media, on media capable of being read by a computer or other recorded media.  This includes but is not limited to diskettes, stored electronic communications, taped messages, electronic date/memo minders/ address bookds and video cassettes;

11.  Any and all communication devices, including but not limited to, digital display pagers (beepers), cellular telephones, speed dialers, answering machines, and facsimile machines;

12.  Indicia of occupancy, residency, rental and/or ownership of the premises . . .

13.  Luggage used for travel, and airline travel identification tags;

14.  Vehicle registration records, titles, and insurance records;

15.  Any and all documents evidencing contact or association with any other member of the drug trafficking and money laundering organization . . .; [and]

16.  Firearms.

(Search Warrants Nos. 03-X-4147 and 03-X-4148 at Attachment B.)

Agent DeBottis's sworn affidavit made in support of the warrants comprises two sections including a three-page section titled "Affidavit in Support of Search Warrant" and a five-page "Investigative Background" section.  Both were presented to the magistrate judge.  In the three-page "Affidavit" section, DeBottis states that the he has eighteen years of experience as a police officer and has been involved in investigations of narcotics trafficking and manufacture, including but not limited to methamphetamine.

3

(Aff. at ¶ 1.)  He also states that he has received specific training "pursuant to the
manufacturing and distribution of methamphetamine."  (*Id.*)  The "Affidavit" section goes
on to list observations associated with his experience investigating drug trafficking.  For
example in detailing common conduct of narcotics traffickers he states, that based on
his experience:

> A.  Drug traffickers obtain chemicals, specific glassware, and laboratory
> equipment for the purpose of illicitly manufacturing controlled substances;
>
> B.  Drug traffickers maintain books, records, receipts, notes, ledger and
> other papers relating to [their activities] . . . [and] that it is common for
> these traffickers to maintain electronic devices that are used to facilitate
> their criminal activities . . .; [and]
>
> C.  It is common for drug traffickers to conceal narcotics records, narcotics
> proceeds and other related items as described in paragraph A, within their
> residences, garages, safety deposit boxes, business, and automobiles in
> order that they may have ready access to these items . . . .

(*Id.* at ¶ 2, A-K.)

DeBottis's testimony specific to Defendants, their place of business, and
residence is contained in the "Investigative Background" section of the affidavit.  In this
section, DeBottis states that he had been conducting an investigation with other local
and federal law enforcement officers into the "narcotics trafficking and money
laundering activities of Thair F. JABERO aka Andy, described as an Arab male DOB 03-
02-63 and Jihan N. JABERO, an Arab female DOB 10-02-69."  (DeBottis Aff.,
Investigative Background at ¶ 1.)  The affidavit specifically notes that a "DEA
Confidential Source" (the "informant") states that "for the past several years he/she has
purchased bulk quantities of ephedrine for the purpose of manufacturing
methamphetamine, 'Meth', (From 'Andy and his wife,' owners of ANDY'S PARTY
STORE in Durand, Michigan)."  (*Id.* at ¶ 2A.)  The informant stated that the owners of

4

Andy's Party Store sell bulk quantities of ephedrine to other methamphetamine cooks in Livingston and Shiawasses Counties in Michigan, and that the owners were aware that the informant used the ephedrine to manufacture "meth."  (*Id.* at ¶ 2 B-C.)  The informant also stated that he could introduce the undercover agent to the owners of Andy's Party Store.  (*Id.* at ¶ 2C.)

According to DeBottis, the informant did just that on March 7, 2003.  (*Id.* at ¶ 4.)  The Affiant also testified that he queried the Michigan Secretary of State records and identified Defendants as "Andy and his wife," the owners of Andy's Party Store at 8473 East M-71, Durand Michigan.  (*Id.* at ¶ 3.)  DeBottis further avers that the confidential informant confirmed the identification of Defendants by identifying them in photographs of Defendants obtained by Agent DeBottis.  (*Id.*)

DeBottis stated that, on March 7, 2003, the informant introduced him in an undercover capacity to Defendant Jihan Jabero.  Ms. Jabero stated that "Andy was not around;" however, she initiated a conversation with DeBottis, asking if he was interested in individual boxes or cases of ephedrine tabs.  (*Id.* at ¶ 4A.)  Affiant "advised Jihan that he wanted 6 or 8 cases of ephedrine tabs," and he stated that "Jihan pointed to a box of Asthma Relief Ephedrine tabs stating that 'these are what you are looking for, they would work better.'" (*Id.*)  Ms. Jabero also indicated that she would need to contact her husband for the price and advised Affiant to call back later for a fixed price on the cases.  (*Id.*)  According to DeBottis's affidavit, he called Ms. Jabero at a number she had provided him and she advised him to come to the store in a week to make a purchase of the cases of ephedrine.  (*Id.* at ¶4B.)

DeBottis's affidavit next describes the events occurring when he visited the store on 8473 East M-71 on March 30, 2003.  According to affiant, he and the informant met with "Andy" or Defendant Thair Jabero and that it was evident that Thair and the informant were familiar with one another.  (*Id.* at ¶ 5A.)  "Andy" advised DeBottis that "the package was in."  (*Id.* at ¶ 5B.)  According to the agent, Thair Jabero told him and the informant "You know guys it is illegal for me to sell you more than two packages," referring to two individual packages of ephedrine tablets.  (*Id.*)  DeBottis stated that after "Andy" or Thair asked to see the money he directed him and the informant to go behind the store counter to a storage room where the agent removed one case of ephedrine tablets from a shelf and proceeded to the store's sales counter area.  (*Id.*)  According to the affiant, Defendant Thair Jabero charged him $840.00 for the case and "told Affiant to slide the $840.00 under a cardboard box at the end of the sales counter," and DeBottis states that he "never observed Andy ring up the purchase of ephedrine, nor was a sales receipt given."  (*Id.*)  DeBottis also avers that, during this transaction, he negotiated the purchase of two more cases with "Andy" from the party store for $800.00 per case.  (*Id.* at 5C.)

Next, the "Investigative Background" section details the plans "formulated to make a[n] undercover purchase of the two (2) additional cases of ephedrine tablets" on May 16, 2003.  (*Id.* at ¶ 6.)  DeBottis testified that, on this date, he arrived at the store on 8473 East M-71 and met with Defendant Jihan Jabero.  "Jihan advised Affiant that she had three on hand (referring to three cases of ephedrine)," but DeBottis advised her that he wanted two cases.  (*Id.* at 6A.)  According to affiant, Ms. Jabero punched the keys on a calculator and held up the face for him to see, showing the number "1680."

Ms. Jabero stated that this was the price for two.  (*Id.*)  DeBottis stated that he "counted

out $1700.00 (pre-recorded OAF)," and that Ms. Jabero "told [him] to place the money

under the postage machine at the end of the sales counter."  (*Id.*)  Again, DeBottis

stated that he never observed Ms. Jabero ring up the purchase nor was a receipt

provided.  (*Id.*)  DeBottis claims that he was again instructed to go into the storage room

where he observed multiple cases of ephedrine on the shelving units.  (*Id.*)

     Prior to leaving Defendants' place of business on this occasion, the affiant stated

that he and Ms. Jabero "discussed [his] obtaining 60 mg ephedrine tablets, as opposed

to the 12.5 mg tablets which the Affiant was currently purchasing."  (*Id.* at ¶ 6B.)

According to the affidavit,

> Jihan asked Affiant "what do you do with all the pills?" Affiant told Jihan "I
> use them to cook meth, and 60 mg tablets cook up better than these."
> Jihan inquired if Affiant made lots of money (referring to cooking and
> selling meth).  Affiant advised Jihan "we make a lot of money."  Jihan
> inquired how many cases of ephedrine Affiant would like to purchase the
> following week.  [He] advised "no more than 10 cases."  Prior to exiting the
> store, Jihan asked Affiant "if everything was cool?"  Affiant inquired what
> Jihan meant by that statement.  Jihan responded "Are you cops?
> Because I could lose my liquor license for selling large quantities of
> ephedrine pills."  Affiant reassured Jihan everything "was cool."

(*Id.*)

     The affidavit also detailed that DeBottis made arrangements with Defendant

Jihan Jabero to purchase four more cases of ephedrine on May 30, 2003 and two more

cases on June 24, 2003.  (*Id.* at ¶¶ 7 & 8.)  DeBottis purchased these bulk quantities as

planned, and Defendant Ms. Jabero agreed to sell yet another three cases at a later

date.  (*Id.* at 9.)

     DeBottis also stated that on July 11, 2003, plans were formulated to make an

undercover drop of $20,000.00 to Defendant Jihan Jabero for the purpose of laundering

7

the money through the use of a "Money Gram Service" at Andy's Party Store.  (*Id.* at ¶¶

8C & 9.)  According to DeBottis, he returned to the store on July 14, 2003 to check on

the money gram service.

> Jihan advised [him], "I had big problems trying to send the money.  Money
> Gram asked too many questions and I got nervous.  I want to do this for
> you, but you have to stand here and answer the questions."  Affiant
> declined and asked for the $20,000.00 (pre-recorded OAF) back.  Jihan
> handed Affiant a different paper bag containing the $20,000.00 (pre-
> recorded OAF).  The bag was different than the McDonald's bag that
> Affiant provided the $20,000.00 (pre-recorded OAF) in.  Jihan stated, "The
> money is all there, no one but my husband (Thair JABERO) touched it.  he
> put it in the other bag."  Jihan stated, "the lady at Money Gram asked too
> many questions like, telephone number and social security number."
> Jihan states "If you want maybe I can send one a day, or you can do it
> yourself."  Jihan apologized and stated "I want to do it for you, but I can't.
> I need more information for even smaller amounts.  Maybe we can go to
> the bank and get money orders."  Affiant declined and advised Jihan that
> he would look into other means of shipping the money.

(*Id.* at ¶ 9B.)

Based on his statements made in support of the warrant, summarized in part

above, DeBottis believed there was "probable cause to believe that 6367 Dalton Drive,

Flushing Michigan and 8473 E. M-71 Durand, MI will contain documentary evidence of

violations of 21 U.S.C. §§ 846, 841 and 18 U.S.C. 1956 and 1957 . . . ."  (*Id.*)  The

magistrate judge agreed and issued search warrants for both locations.

Defendants' motion to suppress is based on two challenges to the search

warrants.  First, Defendants argue that any showing of probable cause made by

DeBottis "was tainted by knowingly or recklessly made falsities" made by the agent.

Defendants maintain that comparing copies of the digitally enhanced recorded

conversations between Defendants and the agent and transcripts of those recordings

with the affiant's statements reveals the false and reckless nature of DeBottis's

8

statements made in the search warrant affidavits.  They argue that this comparison warrants an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). Second, Defendants argue that "even upon its face, the affidavit upon which the warrants were predicated failed to make out probable cause for the search of defendants' home."  (Defs.' Mot. Br. at 1.)

## II.  DISCUSSION

### A.  Whether Defendants Have Demonstrated that a *Franks* Hearing is Required

In *Franks v. Delaware*, the Supreme Court recognized a defendant's right to challenge the sufficiency of a previously issued and executed warrant by attacking the statements made in an affidavit in support of a warrant.  "In order to obtain an evidentiary hearing, the defendant must make a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included in the affidavit."  *United States v. Stewart*, 306 F.3d 295, 304-05 (6th Cir. 2002) (citing *Franks,* 438 U.S. at 155-56).  "This substantial showing is necessary because a challenge to the veracity of the search warrant affidavit must overcome the presumption that the affidavit is valid.  *United States v. Rodriguez-Suazo*, 346 F.3d 637, 648 (6th Cir. 2003).  The statement also must be made by the affiant himself, not by a non-government informant.  *Id.*  "If the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request."  *Stewart*, 306 F.3d at 304.  However, "[t]he inquiry does not continue if the court finds that the exclusion of the allegedly false statement was necessary for a finding of probable cause."  *Mays v. City of Dayton*, 134 F.3d 809, 815 (6th Cir. 1998).  If a substantial showing of false or reckless statements is made and the

defendant establishes, by a preponderance of the evidence, that the affiant either

knowingly or with reckless disregard included a false statement in the affidavit, then any

evidence and fruits of the search would be excluded. *Rodriguez-Suazo*, 346 F.3d at

648.

The Sixth Circuit has described the two parts of a *Franks* inquiry as follows:

*Franks* recognized a defendant's right to challenge the sufficiency of an executed search warrant on the basis that "a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and ... the allegedly false statement is necessary to the finding of probable cause[.]" 438 U.S. at 155-56, 98 S.Ct. at 2676. However, under *Franks* the defendant is entitled to an evidentiary hearing on the veracity of the statements in the affidavit

if and only if (1) there is a substantial preliminary showing that specified portions of the affiant's averments are deliberately or recklessly false *and* (2) a finding of probable cause would not be supported by the remaining content of the affidavit when the allegedly false material is set to one side.

*United States v. Atkin*, 107 F.3d 1213, 1216-17 (6th Cir. 1997) (quoting *United States v.

Campbell*, 878 F.2d 170, 171 (6th Cir. 1989)); *see also Hale v. Kart*, 396 F.3d 721, 726

& n.4 (6th Cir. 2005) (describing the two parts of the *Franks* inquiry and noting that a

defendant must make a substantial preliminary showing that the affiant intended to

mislead the reviewing magistrate).

In the context of a warrant application "[a]n affiant cannot be expected to include

in an affidavit every piece of information gathered in the course of an investigation" and

"*Franks* recognizes that information an affiant reports may not ultimately be accurate."

In fact, courts are "willing to tolerate such a result at th[is] early stage of the process, so

long as the affiant believed the accuracy of the statement at the time it was made."

10

*Mays*, 134 F.3d at 816.  Deliberate indifference to the truth of statements made during the warrant application, however, is not tolerated under *Franks*.  *Id.*

It is Defendants' burden to "specifically point to the disputed portions of the challenged affidavit, and [they] must support these charges with an offer of proof." *Stewart*, 306 F.3d at 304.  Here, six of the seven undercover visits made to Andy's Party Store were recorded by the agent.  Defendants obtained those recordings during voluntary discovery and have produced electronically enhanced copies.  Defendants also employed the services of a proposed "forensic linguistics" expert, Dr. Roger. W. Shuy.  These enhanced copies have been furnished to, reviewed, analyzed, and transcribed by Dr. Shuy.  Shuy's comparison of the statements made by the affiant in the warrant application process and of his transcription of the conversations recorded on May 16, May 30, June 24, July 11, and July 14, 2003 are set forth in his "Statement Under Penalty of Perjury of Roger W. Shuy Regarding Search Warrant Affidavit," and this statement is attached as an exhibit to Defendants' motion.  On March 25, 2005, upon court direction, the government filed its "Comments to Roger Shuy's Comparison of "Investigative Background" with Tape Recording(s)."

According to Defendants, "review of th[e] recordings establishes that the representations made by [agent] DeBottis in his affidavit are grossly inaccurate, and that the recordings do not in fact reflect what TFA DeBottis said they did."  (Defs.' Mot. Br. at 3.)  Defendants argue that DeBottis was a party to the recorded conversations and comparing his statements made in support of the warrants with Dr. Shuy's transcript of five conversations leads to the inescapable conclusion that his statements regarding those conversations were knowingly false or made with reckless disregard for the truth.

11

Defendants argue that Shuy's comparison meets the "substantial preliminary showing" of intent under *Franks* and that the false statements are necessary to establish probable cause.

The government argues that Defendants have failed to meet the initial showing required under *Franks* because they "have provided no facts to demonstrate that the challenged representations made by Agent DeBottis were false." (Gov. Resp. at 12.) The government argues that the only evidence offered to show the alleged falseness or recklessness of DeBottis's statements is the opinion of Dr. Shuy. The government also claims that "[e]ven if the *opinion* is accepted as true, it is apparent from Shuy's review that he is unable to provide a complete analysis of [the] recorded conversations because he reports significant portions of the challenged representations as inaudible." (*Id.* at n.8.) The government further argues that, under the second part of the court's *Franks* inquiry, the warrants are still supported by probable cause when the allegedly false statements are set aside.

Upon reviewing Dr. Shuy's statement, his comparison chart, the government's response, the affidavit, and the enhanced recordings, the court finds that Defendants have not made a substantial showing that DeBottis's affidavit statements were knowingly false or made with reckless disregard for the truth.

The parties have identified four disputed passages for which they have provided competing transcripts. These passages are taken from the recorded conversations on May 16, May 30, and June 24, 2003. These disputed passages were enhanced from the analog tapes identified as government exhibits N-2, N-3, N-4, and N-5. (*See* "Order Denying 'Defendants' Motion Regarding Tapes and Transcripts;'" *see also* Defs.'

12/02/04 letter and enclosure identifying the four disputed passages.)  Much of the five

recordings relied on in this motion by Defendants to make a preliminary *Franks* showing

are reflected in these four disputed passages (and the MP3 files lodged with the court

containing the enhanced versions of these passages).  The parties have also furnished

the court with tapes and enhanced compact disc copies of the recorded conversations

reflected in government exhibits N-1 through N-9 and N-21.

### The May 16, 2003 Recording (Disputed Passage 1)

With respect to the May 16, 2003 recorded conversation, Defendants identify the

following statements in the affidavit which are "not on the tape" (i.e. not heard on the

enhanced version of the recording):

- Jihan advised Affiant that she had three on hand
- Affiant stated he wanted 2 cases
- Jihan advised Affiant to place the money under the postage machine at the end of the sales counter
- Jihan inquired if Affiant made lots of money
- Jihan inquired how many cases of ephedrine Affiant would like to purchase the following week
- Affiant inquired what Jihan meant by asking "if everything was cool"

(04/23/04 Shuy Statement, Comparison at 1-2; Gov.'s Resp. at 3-4.)

The government argues, and the court agrees, that the defense transcript of the

portions of the May 16, 2003 recording show that portions of this conversation are not

clearly audible.  As such, the absence of these *specific* statements on a recording of the

conversation does not establish that DeBottis made these statements falsely or with

reckless disregard for the truth.  The affidavit summarizes the events of the agent's

undercover meetings with Defendants.  DeBottis did not represent to the magistrate

judge that *specific* statements were made *and* definitively heard on the recordings.

Although the affiant attributes quotes to himself and Defendants in the affidavit, this not

13

a case where DeBottis swore that the recordings contained all of the exact quotes that he conveyed,  The agent's use of quotations in his affidavit leads to some inaccuracies or inconsistencies, but the underlying facts asserted by DeBottis are still supported by the record evidence.  The court reviews these identified inaccuracies keeping in mind that the affidavit was drafted by a non-lawyer in the midst of a criminal investigation. *Mays*, 134 F.3d at 815.  "A showing of mere negligence or simple factual error in an affidavit is insufficient to trigger a *Franks* hearing."  *United States v. Brown,* 322 F. Supp. 2d 101, 108 (D. Mass. 2004) (citing *United States v. Monaco,* 700 F.2d 577, 580 (10th Cir. 1983)).

The fact that the recording does not contain these specific statements by DeBottis does not suggest an intention to mislead by excluding critical information from the affidavit.  His affidavit makes clear that he was present when the statement were recorded, and that the affidavit was based on his personal knowledge of the conversations and events, not merely on the contents of recordings to which he listened.  "The mere existence of omissions alone is ordinarily not enough to make [a] strong preliminary showing" under *Franks*.  *Hale*, 396 F.3d at 727.

Dr. Shuy's comparison of the statements made in the "Investigative Background" with the enhanced recording also purport to identify inconsistencies between DeBottis's statements and the transcript of the conversation developed by Dr. Shuy.  The court notes here that the government's response to Dr. Shuy's comparison incorporates by reference its comparison of the competing transcripts for the four disputed passages of the conversations recorded on May 16, May 30, and June 24, 2004.

First, Dr. Shuy identifies the statement by DeBottis that "Jihan advised Affiant to go to the storage room of the store to get two cases of ephedrine."  (Shuy Statement, Comparison at 1.)  Shuy maintains that the corresponding conversation on the recording provides:

> Ms. Jabero: Right here.  Wanna take these?
> Agent: Yeah, see you out back?
> Ms. Jabero: No, I got them.
> Agent: Right here?
> Ms. Jabero: Yeah.
> Agent.  Jihan, want me to got to the back?
> Ms. Jabero: No, they're over here.
> Agent: Oh, you've got 'em right here.

(Gov.'s Resp. Comparison at 3-4.)  The government's transcript of this portion of the conversation reads,

> UC: Jihan you want me to go in the back?
> Ms. Jabero: No, I got them right here.
> UC: Oh, you've got them right there.

(*Id.*)

The transcripts of the recording and the recording itself do not specifically contain statements establishing that Ms. Jabero told the affiant to go to the storage room on May 16, 2003.  Instead, the evidence reveals that the agent asked Ms. Jabero if she wanted him to go to the back, to which she replied no.  This inconsistency is not, however, material or necessarily suggestive of an intent to mislead the magistrate judge.  The fact that DeBottis asked Defendant Jihan if she wanted him to go to the back of the store actually supports his statement describing his prior purchase of ephedrine from Defendant Thair Jabero on March 30, 2003.  (*See* Aff. Investigative Background at § 5B.)  His question to Jihan Jabero was consistent with his statement that, on March 30, he went to the storage room to obtain cases of ephedrine.  That

15

DeBottis may have inaccurately described the details of how he purchased ephedrine on May 16, 2004 does not suggest reckless disregard for the truth.  *See Mays*, 134 F.3d at 816 ("*Franks* recognized that information an affiant reports may not ultimately be accurate, and is willing to tolerate such a result as that early stage of the process, so long as the affiant believed the accuracy of the statement at the time it was made"). "Clearly, an affidavit should not be judged on formalities, as long as probable cause is evident."  *Id.* at 815.

Second, Shuy identifies the affidavit statement that "Affiant and Ms. Jabero discussed the Affiant obtaining 60mg ephedrine tablets which the Affiant was currently purchasing."  (Gov. Resp. Comparison at 4.)  Defendants maintain that Shuy's transcript correspondingly shows that the agent stated "The other ones would cook up better, these ones like the, these they're sixties."  (*Id.*)  This statement, however, is not inconsistent with DeBottis's representation that he and Defendant Jihan Jabero discussed him obtaining 60 mg tablets.  The transcribed statement suggests that DeBottis was explaining that the "sixties" i.e. 60 mg tablets "cook up better."  This exchange is consistent with a desire by the agent to obtain 60 mg tablets.  In addition, Defendants' own proposed transcript has DeBottis stating "sometimes you get 'em with the more milligrams of ephedrine."

Third, Defendants identify the statements by DeBottis that "Jabero asked Affiant what do you do with all the pills?", "Affiant told Jihan 'I use them to cook meth and 60 mg tablets cook up better,'" and "Affiant advised Jihan 'we make a lot of money.'" (*Id.*) Defendants claim that the only corresponding statements for these representations in the recording is Ms. Jabero statement "It's none of my business," and DeBottis

16

response "Making money, ma'am, making mo(inaudible)." (*Id.*)  The government maintains that the recording shows that Ms. Jabero asked "what are you doing with these, it's none of my business but," and DeBottis responded "making money, making meth."  After listening to the enhanced version of the recorded conversation, the court cannot find evidence that would undermine these representations by DeBottis (i.e. Debottis may have said "making money, making meth").

Fourth, Defendants identify DeBottis's statement that Ms. Jabero inquired how many cases of ephedrine Affiant would like to purchase the following week and the agent's response advising Ms. Jabero "no more than 10 cases."  Defendants argue that this statement is not on the May 16, 2003 recording but is found on the May 30, 2003 tape.  (*Id.* at 4.)  The court agrees with the Government that the recording does reflect the agent saying "not more than 10 at a time" and this statement is therefore consistent with the representations made in the affidavit.

Lastly, Defendants claim that the May 16, 2003 recording does not support the affiant's statements that Ms. Jabero asked him "if everything was cool" and that she asked "Are you cops?" after he inquired what she meant by her question.  (Aff. Investigative Background at § 6B.)  Defendants acknowledge that Ms. Jabero asked "if everything was cool" on the May 30 recording and that the agent assured her "everything was cool."  However, Defendants claim that these statements are not on the May 16, 2003 recording as described by DeBottis in his search warrant affidavit.

Even if DeBottis erred in recalling when these statements were made, Defendants acknowledge that fact that they were made.  The value of these statements in the probable cause determination does not necessarily depend on whether the

17

exchange occurred on the second or third visit by the undercover agent.  Nor does

attributing the exchange to an incorrect date show an intent to deceive the magistrate or

reckless disregard for the truth.

### The May 30, 2003 Recording (Disputed Passages 2 & 3)

Defendants identify the following statements as "not on the tape" for the May 30,

2003 recording:

- Affiant responded that cost was too high after Jihan told him the cost
- Jihan requested Affiant to follow her into the storage area
- Jihan asked Affiant "did you make a good profit of the last batch?
- Jihan . . . stated "maybe next time you buy a case of these and see if they work"
- Jihan inquired of Affiant, "yours are on the end"

(Gov.'s Resp. Comparison at 6-9.)

The fact that these statements are not clearly recorded does not suggest an

intent to deceive the judicial officer issuing the warrant, nor do they demonstrate

reckless disregard for the truth.  For example, the absence on the recording of a

statement by Defendant Jihan Jabero requesting for DeBottis to follow her into the

storage area does little to undercut the presumption of validity for the affidavit.  The

request could have been signaled by conduct or simply not have been recorded.  In

addition, Defendants' version of May 30 conversation shows that in discussing "full

cases" (four according to the government) Ms. Jabero stated "yeah, yeah, yeah but four,

probably in the back room."  Thus there is evidence within Defendants' own transcript

that the cases may have been in the back storage room of the store.

Dr. Shuy's comparison also contrasts several statements made by DeBottis with

his transcription of the May 30, 2003 recording.  First, he identifies the statement that

18

"Jihan asked Affiant 'how many today?'" According to his transcript, the recording

merely contains the following exchange:

> Agent: Do you have four?
> Ms. Jabero: Four?
> Agent: Yeah
> Ms. Jabero: Frightened of that.
> Agent.  No way.  This is crazy.

(*Id.* at 6.)  Shuy further notes that the affiant claims he responded to Ms. Jabero by

saying "four," but the recording shows that it was the agent who first asked Ms. Jabero if

she had four cases.  (*Id.*)  The government responds to this claim by claiming that

DeBottis asks for "four, four cases."  Although the recording is not congruent with

affiant's description of the initial exchange between Ms. Jabero and the agent on May

30, 2003, this inconsistency does not undermine the clear import of the recorded

conversation where they discussed the purchase of four cases.

Second, Defendants compare DeBottis's representations that "Jihan told Affiant

'the cost is $3360.00'" and that "ephedrine was supposed to be cheaper with larger

quantity purchases." to Dr. Shuy's transcript of the May 30 recording.  (*Id.*)  The

corresponding transcription passages provide:

> (Topic brought up by Agent)
> Agent: Eight forty last time.
> Ms. Jabero: That's what I get for them, thirty three fifty, that's what I paid for
> them."
>                             . . .
> Agent: Everything's [sic] cool.  We get a better deal?
> Ms. Jabero: Everything comes in packages, twenty four cartons on the shelf.

(*Id.*)  In opposition, the government notes that a portion of the statement on the

recording is inaudible and that Jihan Jabero said "I get for 23, 50 . . . I go to do for

3350," recognizing that the affidavit contains a typographical error.  The amount $3360 should be $3350.

The court is not convinced that the recording undermines the veracity of DeBottis's statements.  The parties discussed a price for four cases and the ten-dollar typographical error is insufficient to establish reckless disregard for the truth in seeking the warrants and the portion of Shuy's transcript where DeBottis and Ms. Jabero are discussing a "better deal" is consistent with the agent's statement that "ephedrine was supposed to be cheaper with larger quantity purchases."  (*Id.*)

Third, Defendants challenge the veracity of DeBottis's statement that "Affiant asked Jihan 'if she or Andy obtain[ed] the 60 mg ephedrine tabs.'" (*Id.* at 7.) Defendants argue that the agent merely stated "Did <u>you</u> check on those other ones for me" without mentioning the 60 milligrams or "Andy."  (*Id.*)  The government maintains that DeBottis asked Ms. Jabero if she "check[ed] on those other ones for me . . . The sixty milligrams" and that Ms. Jabero stated "<u>we</u> can."  (*Id.*)

The court agrees with the Government that the recording provides a sufficient basis to support a general averment that DeBottis inquired as to whether the Defendants had the 60mg tabs for purchase.  DeBottis's statements in the "Investigative Background" portion of his affidavit are recorded in narrative form and contain quotes attributed to himself and Defendants.  His affidavit does not swear that all of these quotations were captured in the recordings.  "Affidavits in support of search warrants 'are normally drafted by nonlawyers in the midst and haste of a criminal investigation.'" *Mays*, 134 F.3d at 815 (quoting *United States v. Ventresca*, 380 U.S. 102, 108 (1965)).

Next, Defendants challenge the statement in the affidavit that Ms. Jabero advised DeBottis "the ones you are purchasing are the best."  (Gov.'s Resp. Comparison at 7.) Dr. Shuy's corresponding transcript of the recording states:

> Ms. Jabero: I don't know how they [the 60 mg tabs] would work
> Agent: You don't know how these would work?
> Ms. Jabero: No, I don't know.
> Agent: You think these are better though?
> Ms. Jabero: I don't know.  See I don't take them.  I always . . . drink energy drinks.

(*Id.*)

The government responds by identifying a portion of the May 30, 2003 recording where Ms. Jabero states "these probably are, would work better" and that portions of the recording are inaudible.  The court finds that the enhanced recording could support a finding that Jihan Jabero stated "I know but these work better."  The parties dispute whether this part of the recording is inaudible, but the evidence does not undermine the veracity of the statement in the affidavit.

Defendants also claim that the following affidavit statements and corresponding transcript passages tend to show DeBottis's gross inaccuracy and reckless disregard for the truth in seeking the search warrants.  These statements also concern the May 30, 2003 conversation and are also reflected in the parties disputed passage number 3.

| Affidavit Statement | Defs.' Corresponding Transcript |
|---|---|
| Jihan stated "I sell lots of them to other people" | Agent: You sell these too?<br>Jihan: I sell more of them than I sell these. |
| Jihan advised DeBottis "I can get these for you, but they are more expensive." | Jihan: I think maybe next time you should try one of those (IA)<br>Agent: Try one of those?<br>Jihan: Do you want to try one? (IA) a little more expensive.  Better value than these. |

21

| | |
|---|---|
| Jihan inquired of DeBottis "How many cases for the next purchase?" | Agent: Alright, if you will ask him then, uh, maybe next time I'd like to get ten. |
| DeBottis told Jihan "10 cases but to work on the price" | Agent: We'll try to get ten.  What kind of price for ten?<br>Jihan: You already finished everything. |
| Jihan stated she would get with "Andy" on the pricing | (Defendants claim that it is unclear whether Jihan needs to talk with Andy or the distributor) |
| Jihan asked DeBottis "is everything cool?" | (Jihan demanded, did not ask)<br>Jihan: It's got to be cool, you know. |
| Jihan stated to DeBottis "I do not like to talk on the phone" | Agent: I know you don't like to talk on the telephone (suggesting this first) |
| "but you call me, say it is Pat and I will say not yet or come see me today" | Agent: Alright and then I'll just call (IA)<br>But if you call say like, I'm coming in (IA)<br>And I will Say well not yet because. |

(*See* Gov.'s Resp. Comparison at 8-9.)

    None of these identified statements demonstrates that DeBottis's statements

were falsely made or made with reckless disregard for the truth.  The recording and

transcripts indicate that Jihan and DeBottis discussed the type of pills that she sold.

There is also a sufficient basis to conclude that Ms. Jabero, when potentially referring to

trying "one of those" meant other types of ephedrine and that she stated that they were

"a little more expensive" and a "better value."  This alleged inconsistency does not

support the need for a *Franks* hearing.  The recording and the competing transcripts

also demonstrate that DeBottis and Jihan Jabero discussed how many cases he would

buy in his next purchase.  That DeBottis may have first indicated how many cases he

was interested in buying first or that he asked "what kind of price for ten [cases]?", does

not render his statement knowingly false.  In sum, the evidence related to the May 30,

2003 recorded conversation does favor Defendants' request for a *Franks* evidentiary

hearing.

### The June 24, 2003 Recordings (Disputed Passage 4 and Gov. Tapes N-4 & 5)

Defendants cite fourteen statements and corresponding passages from Dr.

Shuy's transcripts of conversation recorded on June 24, 2003 in support of their

argument that this comparison entitles them to an evidentiary hearing.

| Affidavit Statement | Defs.' Corresponding Transcript |
|---|---|
| Affiant advised Jihan that he wanted to purchase two cases | Agent: Two today. |
| Jihan told Affiant, "I only have two cases available and my supplier is getting tough on them for purchasing large quantities of the ephedrine tablets" | Jihan: No, I can only give you two . . . Those are the only ones I have.  That guy is being tough on me.  He is not giving me much |
| Jihan stated "I can get cases of the other kind and the price would be cheaper than the ones your (sic) buying." | Jihan: I can get the other ones. Agent: What other ones?  The ones we talked? Jihan: Yeah. Agent: What does he charge for? I mean I can get them for the same? Jihan: Yeah, if you want to.  Yeah, he will charge, it won't be more than that. Agent: It will be less maybe? Jihan: Hopefully, I as thinking maybe I can get him down around eight hundred or something. |
| Affiant advised Jihan that Affiant attempted to call her by telephone | Agent: I called you, remember? I called you, I called you. |
| Jihan stated "I know you called, but I don't like to talk over the telephone." | Agent: I know you don't want to talk on the phone. Jihan: No. |
| Affiant requested Jihan to order six cases of ephedrine tabs for the next purchase | Agent: See if we can get, maybe get six more. |

| | |
|---|---|
| Jihan stated "It is getting harder to get ..." | Agent: Things have been, things have been harder and harder to get.<br>Jihan: Yeah, I know.<br>Agent: Gets harder and harder. |
| Jihan stated "I have lots of other people I sell to and supplies are low" | Agent: Do you have a lot of people buying these by the case?<br>Jihan: No, no. |
| Jihan told Affiant "the two cases are going to be $1700.00 because the price is going up." | Jihan: We have to do eight fifty, I do. . . . They charge me a lot more for them. |
| Affiant told Jihan "I want to send $20,000 out west for supplies." | Agent: I've gotta send some money out west for some ingredients that I want and I got like twenty thousand I need to send. |
| Jihan stated "I can send out $5,000.00 at a time without the government finding out." | Agent: We can't send it all at once, the twenty thousand.  I don't because I don't want people to get suspicious.<br>Jihan: Can you do one ten thousand a day?<br>Agent: Yeah, but they still –<br>Jihan: How about two five thousands? |
| Jihan stated "You bring me 10 or 12 drivers licenses that are legal and fill these applications out for me, give me one a week and I will send it out for you." | Agent: What if we do this?  What if I bring you the money and I bring you like ten drivers licenses and just put them under different names?<br>Jihan: I don't care how you do it . . as long as the driver licenses are all legal.<br>Agent: They are legal.  They're good . . . I can bring in like ten, then just put a little bit under each one. |
| Jihan asked Affiant, "Do you want me to get the other stuff?" | Jihan: Alright, I'll see if I can get the other stuff. |
| Affiant said "He would get with her in the middle of the month" | Jihan: Probably the middle of next month?<br>Agent: Middle of next month.  Okay. |

(Gov.'s Resp. Comparison at 10-12.)

       Examining these statements and corresponding portions of Dr. Shuy's

transcripts, along with the government's proposed transcripts *and* the enhanced

recordings themselves, does not favor a substantial showing that DeBottis's statements were knowingly false or made in reckless disregard for the truth.

The evidence and Shuy's own transcript permits the reasonable conclusion that DeBottis advised Ms. Jabero that he wanted to purchase two cases.  The evidence also supports the conclusion that Jihan Jabero conveyed to DeBottis that she could get "the other ones," referring to the other types of ephedrine discussed by the individuals and that "hopefully" the price would be less.  This is a reasonable inference from Ms. Jabero's answer to the question of whether the other cases would be less expensive. She responded "Hopefully, I was thinking maybe I can get him down around eight hundred or something."  Further, there is sufficient support in the recording to support the assertion that Ms. Jabero indicated to DeBottis that she did not like to talk over the telephone.  The recording and transcript also support the statement that DeBottis wanted to order six cases in the future and that Ms. Jabero acknowledged that it was getting "harder and harder."  Portions of this part of the recording are also inaudible. The alleged contradictions or inconsistencies noted by Defendants in the June 24, 2003 recording are simply not sufficient to warrant a *Franks* hearing.

The one comparison identified by Defendants that, upon first glance, might tend to show an improper motive by DeBottis involves his affidavit statement that Ms. Jabero informed him that "I have lots of other people I sell to and supplies are low."  (*Id.* at 11.) Dr. Shuy transcribes the corresponding portion of the conversation as follows: "Agent: Do you have a lot of people buying these by the case?  Jihan: No, no."  (*Id.*)  Thus, Dr. Shuy's statement appears to highlight a contradiction in Ms. Jabero's answer. However, Defendants' own transcript of disputed passage 3 and the actual enhanced

25

recording show that Ms. Jabero's answer was not "No, no," but rather an ambiguous "Oh yeah, no." (Defs.' Transcript of Disputed Passage 3; Gov.'s Resp. Comparison at 11.) This answer followed Ms. Jabero's statement that she sold a "ton" of "mini thins." As such, the record does not support the conclusion that DeBottis's statement was knowingly false.

### The July 11, 2003 Recording (Tapes N-6 & N-7)

Next, there are five statements from the search warrant affidavit compared to passages of Dr. Shuy's transcript of the July 11, 2003 recorded conversation. Although the comparison identifies some minor differences between the statements and the recorded conversation, they also do not undercut the presumption of validity afforded to DeBottis's affidavit. The comparisons are listed as follows:

| Affidavit Statement | Defs.' Corresponding Transcript |
|---|---|
| Affiant advised Jihan to send out two or three money transfers a day to a routing location provided by the Affiant in San Bernadino, California. | Agent: I will like to do two today, two on Saturday . . . have Andy do two on Monday . . . and it's going to San Jose, California. |
| Affiant advised Jihan to secure the balance of the money in a secure location until the money was sent out. | Agent: Don't leave this around the store ... take it home or something. . . . Don't, don't leave it. |
| Jihan reassured Affiant that she would secure the money at her home. | Ms. Jabero: I know it's dangerous. Uh, I need your phone number. |
| Affiant advised Jihan that he would return on July 14, 2003 to pick up the Money Gram transaction/transfer receipt for the $20,000.00 fee for laundering the money for Affiant. | Agent: And then, uh, I'll be up Monday. |

| | |
|---|---|
| Jihan discussed a $200.00 fee for laundering the money for Affiant. | Agent: And then I'll square up with you for your, your portion of that on Monday. Okay?<br>Ms. Jabero: Yeah, yeah, that's fine.<br>Agent: Couple hundred? Couple hundred's Okay?<br>Ms. Jabero: I'm just gonna, you know, see what I can do first. |

(Gov.'s Resp. Comparison at 13.)[1]

First, the misstatement of the destination city in California as "San Bernadino" instead of "San Jose" is not the type of inconsistency leading the court to suspect that the statement was made falsely or with reckless disregard for the truth.  Again, search warrant affidavits are prepared in the heat of an investigation and are not required to be 100% accurate in all respects.  *See Mays*, 134 F.3d at 816 (a certain level of inaccuracy is tolerated under *Franks* so long at the affiant believed the accuracy of his statements).  Second, the agent's statement "Don't leave this around the store" is consistent with his representation to the magistrate judge that he advised Ms. Jabero to secure the balance of the money.  Third, the agent's statement that he would "be up Monday" is also consistent with his affidavit representation that he advised Ms. Jabero that he would return on July 14, 2003 to pick up the Money Gram receipt.  The court takes judicial notice that July 11, 2003 was a Friday and July 14, 2003 was a Monday.  Finally, Shuy's version of the exchange were Ms. Jabero and DeBottis discussed her "portion" as a "couple hundred" is not inconsistent with his statement that they discussed a $200.00 fee for laundering the money.  Examining this exchange in light of the practical realities

---

[1] Citation is made to the government's response comparison for convenience. The government's response comparison includes Dr. Shuy's comparison of the statements and his transcript, as well as the Government's response.

of the situation and personal knowledge attested to by DeBottis counsels against a

finding that his statement was made in reckless disregard for the truth.

### The July 14, 2003 Recordings (Tapes N-8 & N-9)

Finally, Defendants identify ten statements that allegedly conflict with the parties'

conversation recorded on July 14, 2003.  (*See* CD Copies of Recordings, Tracks 4 & 5.)

| Affidavit Statement | Defs.' Corresponding Transcript |
|---|---|
| Jihan advised Affiant "I had big problems trying to send the money Money Gram asked to[o] many questions and I got nervous . . ." | Jihan: I know there's a problem.<br>Agent: What?<br>Jihan: It has to be, I don't do it with ten, ten driver licenses.<br>Agent: I got driver's licenses.<br>Jihan: No, they (IA) has to be ten receivers.<br>Agent: Okay. |
| Jihan stated "I want to do this for you but you have to stand here and answer the questions." | Jihan: 'Cause my husband said no.  It's not legally.  We don't do anything unlegally.  If you wanna do them you have to stay here with me and answer all those questions. |
| Affiant declined to answer the questions | Agent: And answer all those questions? What do they ask? |
| Affiant asked for the $20,000.00 back | Not on tape. |
| Jihan stated "The money is all there, no one but my husband touched it.  He put it in the other bag." | Jihan: Nobody touched the money.  What he did, he just took it and put it in a different bag.  Matter of fact, just came back. |
| Jihan stated "The lady at Money Gram asked too many questions like, telephone number and social security number." | Jihan: But I do need your telephone number. |

28

| | |
|---|---|
| Jihan stated "I want to do it for you, but I can't. I need more information for even smaller amounts. Maybe we can go to the bank and get money orders." | Jihan: I wanted to do it for you but I can't . . . we don't want to do it . . .I am sorry about that Yeah, I know we don't wanna... Why don't you just do a money order? I don't know what's the problem with that... Can't you do that or no? |
| Jihan stated "If you want maybe I can send one a day, or you can do it yourself." | Jihan: I even wanted to do one a day and she didn't want that information. |
| Affiant declined and advised Jihan that he would look into other means of shipping the money. | Agent: Well. Alright, well I'll think about it . . . |
| Jihan asked Affiant if Affiant was interested in the three cases of ephedrine she was saving for him. Affiant advised Jihan that they would have to be purchased later. | Agent: I'm gonna have to wait on those then. 'Cause I gotta wait for this to get out there and come back. Jihan: Oh yeah, I'll take. I haven't did anything with them anyway. Agent: Okay, they're still here? At the store? Okay. |

(Gov.'s Resp. Comparison at 14-15.)

Here, there exists a sufficient basis in the recorded conversation to support the underlying factual representations made to the magistrate judge by DeBottis in his affidavit. Defendants would have the court focus on the form of the representations (i.e. in the form of quotes) rather than on the underlying factual points asserted. Specifically, the court finds support in track number 4 of the enhanced recording of the July 14, 2003 conversation. (*See* CD Copies of enhanced version of July 14, 2003, Track No. 4 at times 3:29 to 4:55, 6:05 to 6:29, 7:05, 10:03 to 10:30, and 8:54 to 9:08.)

Defendants have failed to make a substantial showing to warrant a *Franks* hearing and the court turns next to their argument that the affidavit was insufficient on its face to establish probable cause to search their residence at 6367 Dalton Drive in Flushing, Michigan.

29

**B. Sufficiency of the Affidavit as to the Search Warrant for Defendants' Home**

The United States Constitution provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized." U.S. Const. amend. IV. The Fourth Amendment requires that probable cause be determined by a "neutral and detached magistrate." *Johnson v. United States*, 333 U.S. 10, 14 (1948). The affidavit that the magistrate reviews "must contain adequate supporting facts about the underlying circumstances to show that probable cause exists for the issuance of the warrant." *United States v. Smith*, 182 F.3d 473, 477 (6th Cir. 1999) (relying on *Whiteley v. Warden*, 401 U.S. 560, 563 (1971)). "Probable cause is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *United States v. Bennett,* 905 F.2d 931, 934 (6th Cir. 1990). Furthermore, "probable cause is a fluid concept--turning on the assessment of probabilities in particular factual contexts." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). In determining whether establish probable cause exists, a magistrate must look at the "totality of the circumstances." *Id.* at 230-31. In *Gates*, the Supreme Court held that

> [t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for . . . conclud[ing]" that probable cause existed.

*Id.* at 238-39 (citing *Jones v. United States,* 362 U.S. 257, 271 (1960)). Additionally, the Sixth Circuit instructs the reviewing court to "accord the magistrate's determination great deference." *United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000) (internal citations

30

omitted).  A "magistrate's discretion should only be reversed if it was arbitrarily

exercised."  *Id.*; *see also United States v. Helton*, 314 F.3d 812, 820 (6th Cir. 2003)

("[T]his Court affords 'great deference' to the issuing judge's findings in support of a

search warrant and will not set them aside unless they were arbitrary.").

 Defendants argue that the affidavit in this case fails to establish a nexus between

criminal activity and their home as a place where fruits of such activity will be found.

*See Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978) ("The critical element in a

reasonable search is not that the owner of the property is suspected of crime but that

there is reasonable cause to believe that the specific 'things' to be searched for an

seized are located on the property to which entry is sought.").  Defendants argue that

DeBottis's affidavit fails to provide specific facts to link the alleged criminal activity to

Defendants' home.  Defendants claim that "[h]ere, the *only* specific allegations

regarding the Jaberos' home is the statement in paragraph 9(A), that on July 11, TFA

DeBottis gave Jihan Jabero[ ] a bag containing $20,000, and asked her to keep it in a

safe place, to which she allegedly replied "that she would secure the money at her

home."  (Defs.' Mot. Br. at 4-5 (emphasis in original).)  Defendants maintain that the

following paragraph of the affidavit reflects that "wherever she may have kept the

money, she only did so for three days, and returned it on July 14."  (*Id.* at 5.)

Defendants claim that DeBottis's general opinion based on his experience investigating

drug trafficking that "it is common for drug traffickers to conceal" things in their homes

does not establish a particular nexus between the alleged criminal activity at the store

owned by Defendants and their home.  (*See* DeBottis Aff. at ¶ 2C.)

31

On the other hand, the government argues that the affidavit shows that DeBottis specifically knew that Defendants were the sole owners of Andy's Party Store, that they had sold him nine cases of ephedrine in less than three months, and that it was likely that evidence of these and other bulk distributions associated with a continuing drug trafficking conspiracy would be found at Defendants' home.  (*See* Gov.'s Resp. Br. at 14-15.)

Based on the contents of the affidavit, the magistrate judge had strong reasons to suspect that Defendants were engaged in drug trafficking, including descriptions of the undercover visits and the agent's repeated purchase of bulk quantities of ephedrine. The detailed information in the affidavit focused primarily on the Defendants' place of business.  However, "in the case of drug dealers, evidence is likely to be found where the dealers live."  *United States v. Jones*, 159 F.3d 969, 975 (6th Cir. 1998); *see also United States v. Miggins*, 302 F.3d 384, 393-94 (6th Cir. 2002) (district court erred in finding an absence of probable cause because evidence was likely to be found where drug dealers lived); *United States v. Caicedo*, 85 F.3d 1184, 1192-93 (6th Cir. 1996) (finding probable cause based on affidavit containing representation of affiant-officer that,  based on his experience, "many drug traffickers utilize their homes to conduct their illegal narcotics trafficking activities").

As the Sixth Circuit recently explained, "with continuing criminal operations, any issues of staleness, or the lack of a direct know link between the criminal activity and residence, becomes minimal."  *United States v. Newton*, 389 F.3d 631, 635-36 (6th Cir. 2004) (citing *United States v. Greene*, 250 F.3d 471, 481 (6th Cir. 2001).

32

In *Newton*, the police officers presented sufficient detailed information to support probable cause that the defendant was engaged in a conspiracy to traffic in marijuana. *Newton*, 389 F.3d at 633-34. The officers' investigation also produced evidence sufficient to cause the police to suspect that the defendant maintained residences at three different locales. *Id.* at 636. These locations were conveyed to a magistrate judge who then issue a search warrant for each of the three residences. *Id.* The Sixth Circuit upheld the district court's denial of the defendant's motion to suppress. The *Newton* court explained:

> Given that probable cause generally exists to search for the fruits and instrumentalities of criminal activity at the residence of a drug dealer with continual and ongoing operations, the judge's decisions as to these locales cannot be said to have been arbitrary. Detailed evidence of Newton's operations was provided to the judge. The police then supplied him with evidence that these addresses were locations where Newton was maintaining a residence. *Without regard to any other information in the affidavit, probable cause existed to issue the warrant in relation to these three presumed residences of Newton.*

*Id.* at 636 (emphasis added).

In the instant case, like in *Newton*, the magistrate judge was presented with detailed statements supporting probable cause with regard to Defendants' drug trafficking and ongoing criminal activity. The police also corroborated the fact that Jihan and Thair Jabero were the sole owners of the party store where the alleged drug trafficking was occurring. In fact, Defendants acknowledge that DeBottis represented that Defendant Jihan Jabero indicated to him that she kept money to be laundered at her home. This particular statement is consistent with and corroborates the general observations identified by DeBottis regarding the probable location of fruits and instrumentalities of a drug trafficking conspiracy. It is undisputed that Defendants own

33

and operate their own "party store."  The common-sense practical realities of these circumstances, therefore, also support the conclusion that evidence of drug trafficking would be recovered not only at their store, but also at their home.

This is not a case where the court merely relied on general statements based solely on an officer's experience.  *See Newton*, 389 F.3d at 639-42 (Moore, J. concurring in part, dissenting in part).  The concurring judge in *Newton* agreed with the outcome, but wrote separately to caution against "creating a special rule for drug-related search warrants inappropriate under *Richards v. Wisconsin*, 520 U.S. 547, 556-59 & n.6 (1978)."  *Id.* at 639.  The concurring judge noted that "probable cause to arrest a person for a crime does not automatically give police probable cause to search his residence" and that "an officers 'training and experience' may be considered in determining probable cause [but] cannot substitute for a lack of evidentiary nexus."  *Id.* at 641.  The concurring judge concluded that binding circuit precedent requires "some additional 'plus' to help form a nexus between the place to be searched and the evidence sought."  *Id.*  Here, even under the view of the concurring judge in *Newton*, the "plus factor" would be met by the practical realities of the nature of Defendants' status as small business owners and Defendant Jihan Jabero's specifically alleged statement to DeBottis that she keeps money to be laundered at her home.  These factual considerations permitted the magistrate judge to reasonably infer that fruits of the criminal activity would likely be found at Defendants' place of business and their home.  Defendants motion to suppress will be denied.

## III.  CONCLUSION

IT IS ORDERED that Defendants' "Motion for an Evidentiary Hearing and to

Suppress Evidence Seized Under Search Warrants" [Dkt. # 38] is DENIED.


                         s/Robert H. Cleland
                         ROBERT H. CLELAND
                         UNITED STATES DISTRICT JUDGE


Dated:  April 20, 2005


I hereby certify that a copy of the foregoing document was mailed to counsel of record
on this date, April 20, 2005, by electronic and/or ordinary mail.


                         s/Lisa G. Teets
                         Case Manager and Deputy Clerk
                         (313) 234-5522